*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RIVERBROOK,

      Plaintiff-Appellant,

v

ABIMBOLA FABODE and All Other Occupants,

      Defendants-Appellees.

FOR PUBLICATION
September 17, 2020
9:10 a.m.

No. 349065
Macomb Circuit Court
LC No. 2018-000274-AV

Before: LETICA, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

Humans have long enjoyed the companionship of domesticated animals. In recent years, governments have allowed citizens with certain psychological disabilities to register "Emotional Support Animals" (ESAs) to help them navigate the world. This designation is more fluid than that of a service dog used to assist the blind, or others with obvious needs. And the fuzzy edges of these laws have spawned abuse. We have all heard the tales: a woman claiming a disability who tried to bring an emotional support peacock in the main cabin on a flight, or the United States Department of Transportation requiring airlines to permit emotional support mini horses on passenger airliners.[1] Landlords have also felt the fallout from "emotional support animal" abuses, with tenants purchasing ESA certification online to dodge pet prohibitions in their leases.

In this case, the district and circuit courts abandoned their roles as the gatekeepers of evidence under MRE 702 and rejected the landlord's attempt to challenge the validity of the documents presented by the tenant to support his need for an ESA. This was error. We vacate the

---

[1] See *Emotional Support Peacock Denied Flight by United Airlines*, January 30, 2018, available at <https://www.nbcnews.com/storyline/airplane-mode/emotional-support-peacock-denied-flight-united-airlines-n842971> (accessed September 3, 2020); Chermocha, *US Dept. of Transportation Rules Airlines Must Allow Miniature Horses to Fly as Service Animals*, August 19, 2019, available at <https://www.thedrive.com/news/29332/us-dept-of-transportation-rules-airlines-must-allow-miniature-horses-as-service-animals> (accessed September 9, 2020).

-1-

circuit court order affirming the district court's eviction decision and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Antony Fabode lives in a mobile home on property leased to his sister, Abimbola Fabode, by Riverbrook. In the spring of 2018, Antony obtained a puppy, King, which he claims is a Labrador Retriever mix. Riverbrook suspected that King was actually a Pitbull mix, which is apparently a forbidden breed in the mobile home community. On May 18, 2018, Riverbrook notified Abimbola of the violation and ordered her to remove King from the premises. Antony responded with veterinary records describing King's breed and a May 2, 2018 "USAR" certificate declaring King an "emotional support dog," complete with a registration number. Unsatisfied with this documentation, Riverbrook issued a demand for possession and termination of tenancy, instructing the Fabodes to vacate the residence by June 22.

Antony thereafter secured a letter from Anne Venet, a limited license professional counselor, on letterhead bearing a canine bust. The letter declared Antony's need for an ESA:

> Antony Fabode (DOB: 09/26/1986); has been evaluated by me. I am familiar with the client's history and limitations imposed by the client's disability.

> Antony Fabode has been diagnosed with a Differential Illness[2] under the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) that substantially limits one or more major life activities. The Differential Illness meets the definition of a disability under the Americans with Disability Act, The Fair Housing Act, and the Rehabilitation Act of 1973, § 504.[3] In order to reduce the impairment associated with the disability and enhance the ability to live independently and fully use and enjoy a dwelling, or reduce impairment associated with this diagnosed disability and flying, I am endorsing [ESAs]. The [ESAs] will have a substantial impact in helping Antony cope with symptoms of the disability.

> Reasonable accommodation should be given to Antony such that Antony should be allowed to live with the animals in a dwelling . . . . This letter meets the requirements under the Fair Housing Act . . ., Section 504 of the Rehabilitation Act . . ., and the Americans with Disabilities Act . . . .

---

[2] According to Merriman Webster, in the medical field, a "differential diagnosis" is "the distinguishing of a disease or condition from others presenting similar symptoms." See Merriman-Webster Online Dictionary, available at <https://www.merriam-webster.com/dictionary/differential%20diagnosis#medicalDictionary> (accessed September 1, 2020). A differential diagnosis is made to narrow down the field of possible conditions from which a patient may suffer. "Differential illness" appears to be a misnomer.

[3] What is apparently still routinely referred to as § 504 of the Rehabilitation Act is now 29 USC 794(a).

Riverbrook filed a complaint for eviction in the district court and the Fabodes signed a consent judgment providing that their residency could continue only if "all unauthorized animals" were "permanently removed from the premises." But the Fabodes persevered by attempting to establish that Antony was entitled to retain possession of King as an ESA.

"Skeptical" of Venet's letter, Riverbrook sent her a "resident disability certification form" to complete. Venet gave general answers when asked how the ESA could assist Antony: "The ESA will lessen the symptoms of [Antony's] diagnosed disability according to DSM-V"; and "The ESA is necessary for Antony to enjoy his dwelling as others in the community. There are no other options including medication."

Riverbrook replied, "These registration certificates and/or ID cards are not credible proof of any disability or any disability related need for an assistance animal." Riverbrook implied that Antony purchased the opinion that he required an ESA. The website utilized by Antony stated, "A doctor in our network may be able to prescribe an [ESA] with only one phone call" and that the customer could receive his or her "Doctor Letter for Airline Travel and Housing immediately via email for print and use." The letter produced by Venet was "clearly a form letter" that was not "credible proof" of Antony's disability or need for an ESA, Riverbrook asserted. Rather,

> Ms. Venet's response established that she had no contact with [Antony] prior to May 31, 2018, same date she printed out the form letter declaring him to be disabled due to a "Differential Illness." A person with a disabling mental or emotional condition will have a history of treatment that predates the request for an [ESA]. [Antony's] accommodation request is clearly his attempt to circumvent the community's requirement that the dog be permanently removed.

Riverbrook denied Antony's accommodation request.

Riverbrook applied to the district court to enforce the consent judgment with an order of eviction. The district court granted the motion and ordered Antony's removal by September 28, 2018. The Fabodes sought a stay of eviction, asserting that they were legally authorized to possess King as an ESA and that Riverbrook wrongfully evicted them. The Fabodes continued to rely on Venet's letter and the ESA certification. And Riverbrook continued to question the validity of Venet's assessment that Antony suffered a condition requiring an ESA when she had only briefly spoken to Antony on the phone.

Venet testified at a district court hearing. She asserted that Antony was referred to her through United Support Animals, and that she determined his need for an ESA after a single brief phone call. She denied that a clinician needs to meet with a patient in person to make a diagnosis. Venet reviewed no prior medical records, conducted no diagnostic testing, and provided no counseling to Antony. In fact, Venet explained that diagnostic testing and referring clients for additional counseling was "[b]eyond [her] scope of practice."

The district court limited Riverbrook's questioning of Venet. The court directed that it would not permit questions "into medical decisions" because, the court ruled, "the statute is pretty clear counselor [sic] writes a letter, makes a determination." Riverbrook urged the district court

to consider the evidence presented by the Fabodes more deeply, but the court demurred because it opined that the only thing required is that a "licensed counselor . . . makes a determination."

   *The Court*.  I don't - - I didn't say I like it, okay.  I don't say I agree with this and I think the statute is horribly written and I don't think there's any standards given to it.  And if it's this easy to get, it's incredible to me.  But it's kind of like the same way the statute is written for medical marijuana, okay, you need a physician-client relationship.  Five minutes is a physician-client relationship.  Someone walks into an attorney's office and says I got a question, you know, whether you get money or not, it could be possibly a relationship.  All right, so whether all this other stuff whether she did or dug into is irrelevant the way the statute's written.

   *[Riverbrook's Counsel]*.  It is not irrelevant when you consider that it has to be credible evidence of a disabling medical condition.  We have no credible evidence.  If I can get social security disability based on a telephone conversation, no one in the world would work.

   *The Court*.  This is not social security, this is different.  This is the - - this is the - - this is the way Congress wrote this act.  And - -

   *[Riverbrook's Counsel]*.  Your Honor?

*  *  *

   *[Riverbrook's Counsel]*.  Your Honor, there is case law that would say that the information supplied to the landlord has to be credible and I don't believe her - - her testimony, her letter is credible evidence of a disabling mental condition and that's what is required by the statute, not simply a letter from any old person.

   *The Court*.  Well, I disagree at this point . . . .

   At this point, and like I said, I'm not happy with the way this is done and these certificates I think are really bogus considering there is no real registration out there because all you really need is the letter from the counselor.

   *[Riverbrook's Counsel]*.  A credible letter from the counselor.

   *The Court*.  Well, I don't - - I found nothing uncredible about her, especially, given her background, information as provided, and what the statute limits us to.  Okay, you're - - I don't disagree with you, I'm just stuck with the law.

   *[Riverbrook's Counsel]*.  But you're allowed to look into the facts of the situation.  He didn't have any treatment, he has never had treatment.

   *Defendant*.  That's not true.

*The Court*.  No, no, no, no.  And I think that's beyond the scope of this hearing, okay.  The hearing, my purpose for this hearing is more of this is not whether this was issued correctly or incorrectly, that's not my call.  My call is to make sure that the counselor done it, met the requirements of.  Now, if you want to challenge licensing issues, you want to challenge his state, I guess that's for somewhere else.  But here, it's just a simple, did it meet the requirements of the statute- -

*[Riverbrook's Counsel]*.  So - -

*The Court*.  - - I think it did.  All right, I didn't - - I didn't say I'm happy with my decision, okay, because this opens it up for all kinds of stuff and it opens up for this whole internet thing they've got going which, you know, but- -

*[Riverbrook's Counsel]*.  But - -

*The Court*.  - - they allow it.

*[Riverbrook's Counsel]*.  Well, you allow it, not all courts allow it.

*The Court*.  No, no.  I allow it because everybody else allows it.

*[Riverbrook's Counsel]*.  I don't think so.

\* \* \*

There - - I mean there's case law and that the info - - information has to be credible.  I don't think that based on a phone call from some unknown person, she can say oh, yes, his condition is disabling and he needs a dog.

*The Court*.  They don't require - - the statute doesn't require meeting.  The statute doesn't require treatment.  The statute doesn't require treatment.  The statute doesn't require an ongoing relationship.

*[Riverbrook's Counsel]*.  How can she - -

*The Court*.  The statute doesn't require any of that, okay.  And you're asking me to say, Congress, you need - - you really mean to say this, okay.  I don't think it does.  And the reason I do that is because the way they wrote the - - some of these other - - they didn't think this through, all right, but I'm stuck with what I got.

The district court then denied the writ of eviction.

Riverbrook appealed to the circuit court.  Riverbrook had investigated "USAR" and discovered that the acronym referred to "U.S. Support Animals," whose website "promise[d] a doctor's letter to support an applicant's request for an ESA for $179.99."  Based on this discovery, Riverbrook continued to argue that Antony purchased his diagnosis of a condition requiring an ESA only after Riverbrook notified him that he had violated the pet policy.  Riverbrook contended

-5-

that Venet's letter, based solely on information obtained from Antony and no documented history of treatment, failed to support that Antony had an impairment that substantially limited a major life activity, or a disability-related need for an ESA. Thus, Antony's dog was an unauthorized pet whose presence violated the consent judgment.

Ultimately, the circuit court affirmed the district court's ruling based on the FHA. The circuit court cited caselaw allegedly holding that the "inquiry need not be highly intrusive" and that "medical records or detailed information about the nature of a person's disability is not necessary." Absent a legal requirement for "more stringent proof of a handicap or the necessity of an accommodation," the circuit court agreed that Venet's opinion regarding Antony's need for the ESA was sufficient evidence. The circuit court explained:

> The evidence demonstrates that before and during the proceedings, the parties were in communication regarding whether the occupant's dog was actually an ESA. Based on the evidence presented by Riverbrook, Riverbrook received the information it requested from Venet after it determined that her initial letter was unsatisfactory. Venet completed the Resident Disability Certification Form provided by Riverbrook, but rather than requesting additional information, Riverbrook denied Fabode's request to register the dog based on the date that Venet evaluated the occupant and required the dog to be permanently removed from the home and the community. Riverbrook then filed an application and order of eviction on the basis that it had seen the dog in the community. Fabode filed a motion to stay the writ, alleging that the parties entered into the consent judgment with the understanding that they could keep the ESA on the premises until Riverbrook reviewed all paperwork and it decided whether to accept or deny the animal, and they removed the ESA upon receiving Riverbrook's denial letter on August 17, 2018.

> Based on the totality of the largely undisputed evidence presented, the district court determined that Riverbrook's sole basis for denying Fabode's request for a reasonable accommodation in the form of an ESA was its finding that Venet's assessment was not credible. After taking Venet's testimony, the district court disagreed, expressly finding Venet and her assessment to be credible, and denied the eviction on this basis. This Court finds no clear error in the district court's determination that an ESA on the premises is not a basis for eviction under the terms of the consent judgment, as an ESA is not an "unauthorized animal."

We granted Riverbrook's application for leave to appeal "limited to the issues raised in the application and the supporting brief." *Riverbrook v Fabode*, unpublished order of the Court of Appeals, entered September 11, 2019 (Docket No. 349065).

## II. ANALYSIS

We review de novo a circuit court's affirmance of a district court order. *Noll v Ritzer*, 317 Mich Ap 506, 510; 895 NW2d 192 (2016). We also review de novo the lower courts' interpretation of the relevant statute—the federal Fair Housing Act (FHA). See *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2 d 211 (2010). We review for an abuse of discretion the lower courts'

-6-

decision to admit evidence based on the relevant statute. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016).

The Fabodes raised the FHA in defense of the eviction action. The FHA provides that a landlord may not discriminate "because of a handicap," in part, by "refus[ing] to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 USC 3604(f)(3)(B).

> To prove that a housing provider failed to reasonably accommodate a disability, a plaintiff must prove that: (1) she suffers from a disability within the meaning of FHA; (2) the defendant knew or reasonably should have known of the disability; (3) the requested accommodation may be necessary to afford an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) the defendant refused to make the accommodation. [*Overlook Mut Homes v Spencer*, 415 Fed Appx 617, 621 (CA 6, 2011) (quotation marks and citation omitted).]

A "handicap" or "disability" for purposes of the FHA is defined as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such impairment, or (3) being regarded as having such an impairment." 42 USC 3602(h); 24 CFR 100.201. "Major life activities," in turn, is defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 CFR 100.201(b).

The Fabodes, as the proponents of the FHA defense to the eviction action, bore the burden of proving that Antony had a "handicap" and required accommodation "to use and enjoy his dwelling" because of that handicap. The only evidence presented by the Fabodes was the letter authored by Venet. Venet took the stand but provided no new evidence in the courtroom. Contrary to the district court's conclusion, the court was required to consider the validity of the opinion presented in the letter and determine if the letter actually supported the Fabodes' claim.

MRE 702 governs the admissibility of expert testimony and opinions, such as that of Anne Venet. Pursuant to MRE 702:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702

> requires the circuit court to ensure that each aspect of an expert witness's testimony, including the underlying data and methodology, is reliable. MRE 702 incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert v Merrell Dow Pharm, Inc*, [509 US 579; 113 S Ct 2786; 125 L Ed 2d 469

(1993)], in order to interpret the equivalent federal rule of evidence. Under *Daubert*, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. . . . Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible. [*Elher*, 499 Mich at 22-23 (quotation marks and citations omitted).]

Both the district and circuit courts avoided their gatekeeper role under MRE 702 despite Riverbrook's repeated objections to the reliability and admissibility of the Fabodes' evidence. The circuit court relied on *Overlook Mut Homes*, 415 Fed Appx 617, to avoid its duty of overseeing the validity and reliability of the evidence presented. However, *Overlook* does not support the proposition asserted. Rather, the United States Court of Appeals for the Sixth Circuit held in *Overlook Mut Homes*, 415 Fed Appx at 621-622:

> A housing provider . . . is entitled to seek information from an allegedly disabled person in order to establish the existence of the disability and the necessity of the accommodation. According to the [Joint Statement of the Department of Housing and Urban Development and the Department of Justice, *Reasonable Accommodations Under the Fair Housing Act* (May 14, 2004), available at <https://www.hud.gov/sites/documents/huddojstatement.pdf> (accessed September 11, 2020)],
>
>> [I]n response to a request for a reasonable accommodation, a housing provider may request *reliable* disability-related information that (1) is necessary to verify that the person meets the [FHA's] definition of disability . . ., (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.
>
> *Id*. at 13. This inquiry need not be highly intrusive. "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary . . . ." *Id*. at 13-14. [Emphasis added.]

Consistent with this guidance, Riverbrook asked the Fabodes for reliable information from which it could determine whether Antony truly suffered from a handicap and required an ESA to allow him to use and enjoy his dwelling. The Fabodes responded with the letter from Venet stating that Antony suffered from "differential illness." It appears that this was not actually a diagnosis, but a statement that a diagnosis had yet to be reached. The letter did not identify any of the symptoms of Antony's "differential illness." The record is devoid of any information describing Antony's purported handicap or disability. Did he suffer from anxiety or depression? Was he prone to psychotic episodes? The letter offers no explanation of how King could assist Antony. Does King calm Antony? Does King sense when Antony might experience an episode of his condition? As the district court did not allow the record to be developed, neither the district nor circuit court nor this Court can assess whether Antony has a handicap and requires a reasonable accommodation by Riverbrook of its pet policy to allow King to live in the home and assist his owner.

Further proceedings must be had below before this matter can be resolved. On remand, the district and circuit courts should take careful note of the statutory language. The statute does not provide that a tenant may automatically establish a handicap and a need for an ESA with a simple letter or that the court may not delve into the accuracy or legitimacy of the diagnosing party's opinion. Under MRE 702, the court *must* carefully consider the reliability of the methods employed by Venet, as well as her final opinion. Only then can the district and circuit courts determine if Riverbrook refused to make a reasonable accommodation for a tenant with a disability or handicap.

We vacate the circuit court order affirming the district court judgment and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher